**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | | |
|---|---|---|
| JARRED GLICKSTEIN, | ) | CASE  NO. |
| c/o Agins & Gilman, LLC | ) | |
| 5035 Mayfield Rd., Suite 250 | ) | |
| Lyndhurst, OH 44124 | ) | JUDGE |
| | **)** | |
| PLAINTIFF**,** | ) | |
| vs. | ) | |
| | ) | |
| CASE WESTERN RESERVE UNIVERSITY, | ) | |
| C/O Elizabeth J. Keefer, | ) | |
| 10900 Euclid Ave. | ) | |
| Cleveland, Ohio 44106 | ) | |
| | ) | |
|  and | ) | **COMPLAINT** |
| | **)** | **WITH JURY DEMAND** |
| JOHN GIBBONS | ) | |
| Case Western Reserve University | ) | |
| Sears Undergraduate Design Laboratory | ) | |
| Glennan Bldg. 312 | ) | |
| Cleveland, OH 44106 | ) | |
| | ) | |
| DEFENDANTS. | ) | |

## <u>INTRODUCTION</u>

**1.**      This is a Complaint for redress of violations of Plaintiff's civil rights by Defendant Case

Western Reserve University, and for Defamation, Invasion of Privacy, and Intentional Infliction

of Emotional Distress against all Defendants.  The Complaint seeks injunctive relief and money damages, including punitive damages against all Defendants.

## JURISDICTION AND VENUE

2.     Jurisdiction arises in this Court pursuant to 28 U.S.C. §§ 1331 and 1343.  This action arises under Section 504 of the Rehabilitation Act of 1973 as amended, 29 U.S.C. §794 ("Section 504"), and the Americans with Disabilities Act, as amended ("ADA"), 42 U.S.C. §12101, et seq. Supplemental state claims are asserted pursuant to 28 U.S.C. §1367, state statutes and common law.  Venue is proper pursuant to 20 U.S.C. §1391(b) because the Defendants are located within the jurisdiction of the Northern District of Ohio, Eastern Division and the events in question occurred there.

## PARTIES

3.     Plaintiff Jarred Glickstein is an adult who at all relevant times hereto was a resident of University Heights, Ohio located in Cuyahoga County, Ohio within the Northern District of Ohio. During the events described herein, Plaintiff was a student in the Master's program in electrical engineering at Defendant Case Western Reserve University.

4.     Defendant Case Western Reserve University ("Case") is a not-for-profit corporation, with its principal place of business in Cuyahoga County, Ohio.  Defendant Case is the recipient of federal funds and operated an education program or activity which received federal financial assistance within the meaning of 20 U.S.C. § 1687.

5.     Defendant John Gibbons is currently employed as the Lab Director of the Sears Undergraduate Design Laboratory at Case and is an adjunct instructor in the electrical engineering department there.

2

## FACTS

6.      Jarred Glickstein was admitted as a transfer student to the undergraduate program in electrical engineering at Case in the Fall of 2014.  Jarred transferred from Pennsylvania State University where he was a student in good standing, with straight As, and where he had attained the Dean's List.  Jarred also had credits transferred from The Ohio State University where he had taken college level classes as a senior in high school.  In 2015, Jarred was accepted into the Bachelor of Science/Master's of Science dual degree program in electrical engineering. His intended graduation date was to be in May 2017.

7.      At the time of his admission to Case, Jarred registered with Case's Office of Disability Resources, a division of the Office of Student Affairs at Case.  With diagnoses of autism and anxiety disorder, Jarred was found eligible to receive accommodations from the University and was afforded those in accordance with his needs.  All of Jarred's professors were aware that he was registered with the Disability Services Office even if they did not know the precise disability.

8.      From 2014-2016, Jarred participated first in the undergraduate and then in the combined undergraduate/Master's program at Case in its electrical engineering program.  As per the program requirements, Jarred took classes, and served as a teaching assistant to several professors for three semesters for which he received a stipend.  During the 2015-16 school year, Case paid for Jarred to travel to Britain to do research in the field.

9.      During this period, Jarred completed his classes as required, never achieved any grade lower than "B," and never had any disciplinary or other issue with anyone.  At no time has Jarred Glickstein been convicted of any felony or other crime greater than a minor traffic offense.  Jarred regularly participated in events put on by the Department for its students.

10.     In late October 2016, the Sears Design Laboratory hired a new Lab Director, Defendant Gibbons.  The outgoing lab director, Mr. Burrell, had always worked closely with Jarred, as had the lab technician, George Daher.  With Mr. Burrell's permission, Jarred had kept his personal items in a project room (Room 319) located within the Sears Laboratory space, and was permitted to use the space for projects and other academic endeavors.  Room 319 is on the third floor of the Glennan Building where the electrical engineering classes and offices are also located.

11.     From the outset of their relationship, Mr. Gibbons evidenced suspicion of Jarred, was harsh in his communications with him, and advised others, including Kim Yurchik in the Department's main office, that Jarred needed to get help because Gibbons believed he had mental health issues. Jarred, who had never had a problem with any of the staff at Case, was concerned about the substance and tone of these interactions, and mentioned his concern to his academic advisor, Dr. Mandal, in December 2016.

12.     In December 2016, Gibbons removed Jarred from a teaching position for which Jarred was receiving a stipend.  Unbeknownst to Jarred, Gibbons took over the teaching of the class himself.  Jarred was never told who was teaching the class; only that he would no longer be doing it.

13.     In December 2016, Gibbons informed Jarred, and two other teaching assistants, that they had to remove their personal items from the project rooms in the Sears Lab because the room was not intended to be used as an office.   Jarred removed his things from the project room, as requested, to an office on the 5th floor of the Glennan Building.

14.      On January 11, 2017, Defendant Gibbons sent an email to Jarred asking if he knew the whereabouts of a computer Gibbons said was missing from the computer lab, and specifically

4

from Room 319 which Jarred had previously been using.  The tone of the email made it clear that Gibbons believed Jarred had stolen the computer.  The computer in question was largely obsolete.

15.     Gibbons reported the alleged theft to the campus police officer, Detective Schemmel. Gibbons had no evidence whatsoever that Jarred had taken anything, but by January 13, 2017, had already decided that Jarred had stolen the obsolete computer.  The computer was allegedly stolen some time between December 8, 2016 and January 5, 2017, the first time it was discovered missing.  Gibbons' theory, as described to Detective Schemmel, was that Jarred had taken the computer belonging to the University as "retaliation" for Gibbons having taken over the teaching of the class that Jarred had been teaching prior to the time of Gibbons' hiring.  Again, Jarred Glickstein never knew that his teaching job had been taken over by Gibbons until May 2017 after he heard the audio from his disciplinary hearing.  Nobody else was ever investigated for the alleged theft.

16.     In January 2017, Gibbons went to Jarred's new office space, now on the 5th floor of Glennan, and, without asking permission of anyone, Gibbons "retrieved" items from Jarred's office. On January 23, 2017, Gibbons wrote, "I finished the inventory of the stolen items recovered from Jarred's office – the value comes to $1445.00."  At no time did Gibbons inquire of Jarred as to the origin of those items, and that statement was false when it was made. Schemmel later agreed that those items, taken by Gibbons from Jarred's desk without permission, belonged to Jarred. Those items have never been returned to Jarred.

17.     In January 2017, Officer Schemmel attempted to obtain a search warrant from the Cuyahoga County Prosecutor's office to look for the missing computer at Jarred's house, but the County declined to issue a warrant due to insufficient evidence.  No criminal charges were ever brought in connection with the alleged theft.  A trace investigation into the usage of the allegedly

stolen computer revealed that the computer had last been used on December 8, 2016.  Defendant Gibbons later acknowledged that he was the last person to use it when he "accidentally" logged onto the network by hitting a key.  No evidence ever tied Jarred to the use of the missing computer at this or any other time.  In fact, Jarred never used the computer in Room 319 at any time during his tenure at Case.

18.     Instead, in March 2017, Officer Schemmel initiated disciplinary proceedings against Jarred with the Case Student Conduct Office.  The allegations stated that Jarred was guilty of theft of the computer, unauthorized access to University premises and theft of a book which was found sitting in a bookcase in Jarred's office space in open view.  This book had previously been loaned to Jarred by George Daher.

19.     On March 11, 2017, Gibbons also told Schemmel he would inquire as to whether any other items were missing from Larry Sears' office and would advise him "ASAP" if any items were found to be missing.  It was clear from all the communications that any missing items anywhere would be considered to be the result of theft by Jarred, according to Defendant Gibbons.  Gibbons ended one of his diatribes with "Again, this situation has George and myself VERY worried about Jarred's intent and we are BOTH fearful of future encounters with him for these and other reasons."

20.     On March 15, 2017 Jarred entered the Sears' Design Lab and encountered Gibbons who said to Jarred, "You cannot speak to me or George or be in this lab until investigation of your felony is complete," and further stated that "criminals are not allowed in this lab."   Gibbons knew there was no criminal investigation, and that Jarred had not been adjudged to be a criminal, so this statement was one he knew to be false.  These remarks were said in front of George Daher, the lab technician.  This was the first time Jarred was told he was not allowed in the Lab.

21.     At the time these events took place, all of the equipment and other items in Defendant Gibbons' office at the Sears' Design Lab had stickers with the words "Stolen from John Gibbons" written on the label.

22.     The email communications between Defendant Gibbons and Detective Schemmel during Defendant Case's "investigation" from January 2017 to March 2017 reveal that Gibbons became increasingly angry towards Jarred, resulting in escalating lies and innuendo.  On March 11, 2017, Gibbons sent an email to Detective Schemmel where he referred to Jarred as an "angry, immature student" who had "calculated criminal intent" in reference to the allegedly stolen book was left in open view in Jarred's office.  Gibbons also advised Schemmel that Jarred was "asked to leave the previous two (2) colleges/universities he attended under 'extenuating circumstances.'"  These statements were false and were made for the express purpose of trying to escalate charges against Jarred.  Gibbons then urged Schemmel to contact the police departments at the universities Jarred attended because that would be a "critical component in this developing/ongoing situation," because it might involve a "repeating pattern" of Jarred's conduct.

23.     During the investigation into these charges, Jarred spoke to Detective Schemmel on two separate occasions.  Schemmel told Jarred to acknowledge having taken the items he was accused of stealing even though Jarred steadfastly insisted he did not have them.  Jarred advised Schemmel that he had an anxiety disorder.

24.     Between March 2017 and May 2017, Gibbons' communications about Jarred became even more inflammatory.  In an email on April 6, 2017, Gibbons requested to the head of the student conduct office, Kaleena Rolitsky (now Schmidt), that Jarred's "access to the Glennan 3rd floor Sears Laboratories be permanently revoked and his key card access be permanently rescinded." This request was based on Gibbons' assertion that he had to lock everything up every time Jarred

appeared. He further accused Jarred of "highly unethical behavior on multiple occasions." The third floor of the Glennan Building at Case is the heart of the Electrical Engineering Program. In addition to having the Sears Design Lab housed there, the third floor is where Department events are held, where students congregate, where students pick up mail and access electronic parts necessary to their program, and where project offices are located.

25.     Gibbons further advised Detective Schemmel that he (Gibbons) had done some "homework" in connection with the investigation into Jarred by timing "how long it would take to go from Glennan 319, down the freight elevator to the 1st floor, go out to a car in the 1A parking lot behind Glennan, and come back up to Glennan 319A. With waiting for the elevator included, it was approximately 6 minutes." This comment was supposed to demonstrate that access to the room with the computer was made on December 27, 2016 two times, six minutes apart, in an apparent effort to bolster the false accusations against Jarred. Nobody ever questioned Gibbons how he would know where Jarred parked, or indeed if he had a car at all. Again, nobody else, including Defendant Gibbons, was ever investigated for the "theft" of the computer.

26.     Without any additional evidence tying Jarred to the supposedly stolen computer, the Student Conduct Office scheduled a disciplinary hearing for April 27, 2017. The members of the Conduct Board who heard the "testimony" were a random selection of students and staff who had no apparent training in how such hearings ought to be conducted.

27.     Two days before the disciplinary hearing, Jarred was provided with documents related to the investigation of the allegations. However, not all of the email communications sent by Gibbons to the Student Conduct Office or to Detective Schemmel were shared with Jarred, in violation of Case's policies. For the first time, two days prior to the disciplinary hearing, Jarred was informed that he was being accused of unauthorized access to the project room in the Sears

Design Lab (Room 319) after December 13, 2016.  No person ever informed Jarred that he was not allowed access to that room at all.  The statement Gibbons made to the Conduct Office that Gibbons told Jarred in mid-December 2016 that he was no longer permitted in Room 319 was false.

28.     Prior to the disciplinary hearing, on April 5, 2017, Jarred advised Kaleena Rolitsky Schmidt from the Student Conduct Office that he could not be in the same room as Gibbons because of his anxiety disorder.  No effort was made to enable Jarred to participate in the hearing by phone or video while Gibbons was present, so Jarred did not hear what Gibbons said at the time of the hearing.

29.     At the hearing, Gibbons spoke to the Board and said, among other things, that at least seven people had asked him (Gibbons) as to whether Jarred Glickstein had a gun and that Jarred "scares the living crap out of me…judging from what happened at Weatherhead a few years back."  This was an apparent reference to the "Weatherhead Shooter," Biswanath Halder who, in May 2003, held numerous hostages in the Peter B. Lewis Building on Case's campus, murdered one student and wounded two others. The graduate student representative on the Board, upon hearing this assertion replied that "My brother was on campus at that time so, yes."

30.     When asked why he was afraid of Jarred, Defendant Gibbons replied that he was afraid of Jarred because "of the overall way he presents himself."  Gibbons further stated to the Disciplinary Board that Jarred had "issues" that he was not dealing with and that his refusal to address those issues was "typical for that kind of thing…."

31.     During Gibbons' recitation of these inflammatory statements, no person on the Board ever suggested that these comments were unrelated to the charges, or that Gibbons needed to comply with Case's policy requiring such hearings to be limited to "relevant" evidence.  Instead, the

Board members continued to question Gibbons about the incidents with Jarred that made Gibbons fearful and allowed Gibbons to make inflammatory, false, and irrelevant statements about Jarred.

32.     Gibbons proceeded to tell the Board that he had never met anyone with such a "sense of entitlement" as Jarred, and that Jarred believed the "whole world revolved around him."  At the time this statement was made, Gibbons had had no more than **three** face to face interactions with Jarred that involved the exchange of more than a word or two.

33.     Gibbons described to the Board one interaction with Jarred where he alleged that he could "tell that this could escalate to something physically violent."  Since Jarred was never accused at any time of being physically violent or had ever threatened violence against anyone, this remark was false, intentionally misleading, and intended to taint the hearing process. Again no person on the Board ever advised Mr. Gibbons that these remarks were wholly unrelated to the issues before the Board regarding whether Jarred had stolen a computer.  Jarred was told by Board members, however, that his remarks needed to be kept to "relevant" topics.

34.     Gibbons' explanation as to a purported motive for Jarred to steal an obsolete computer which Jarred had never used, was as retaliation for losing his teaching position.  Nobody on the Board asked why Jarred would retaliate by taking something that never belonged to Gibbons.

35.     At the hearing, Gibbons repeated his false claim that Jarred had been asked to leave his two prior universities.  The Board determined that this statement was false before it rendered its final decision, but never questioned whether it should take other statements by Gibbons at face value when it was apparent that he had already lied.

36.     The Board never addressed who else besides Jarred might have taken the computer. The Board knew that Defendant Gibbons was the last person to use the computer, that he had access to it, and that he had made false and inflammatory claims about Jarred.

37.     The investigation summary prepared by Kaleena Rolitsky Schmidt from Case's Student Conduct Office stated that the investigation never found any direct evidence tying Jarred to the missing computer.  This finding mirrored that of Officer Schemmel.

38.     Jarred has never been in disciplinary or criminal trouble prior to these events beyond minor traffic infractions.

39.     After the hearing, but before a decision was issued, Defendant Gibbons continued to send highly inflammatory emails to Kaleena Schmidt.  On May 2, 2017, in a direct pitch to the Board members, Gibbons requested that the "Conduct Board" address what he said was Jarred's "uncontrolled anger and rage when he perceives that his myopic little world has been violated. You have not seen this side of him – he usually comes across as quiet, reserved and soft-spoken. But I have seen this other side, and the look in his eyes when he is in this state says it all – totally out of control anger that is purely directed at the source of his perceived violation. Mr. Glickstein clearly has some very serious unresolved mental issues that are driving this rage, but that is beyond the scope of this hearing (which I do believe I mentioned this fact in the taped hearing on 4-27-2017)."  "And this question of control should make anyone pause with concern as it has serious ramifications if left unaddressed – what happens when Mr. Glickstein has another 'violation of his world' situation. And him owning a gun or a knife or any kind of weapon is really secondary to the fundamental issue under scrutiny here, albeit that could present dire consequences.  And the Student Conduct Board – just by it's (sic) existence, function and purpose, ultimately takes full responsibility for addressing the safe solution to ALL persons affected by this situation."  He finished by saying "You are the only line of defense we have."  These comments were intended to inflame and to create fear, to subject Jarred to contempt, and to influence the disciplinary process.  Gibbons had no basis for implying that Jarred possessed a

weapon, and he knew that Jarred had never presented a problem before.  He made these inflammatory statements for the purpose of damaging Jarred's reputation at Case and assuring that Jarred would be disciplined.

40.     This email, sent during the pendency of the disciplinary proceeding, was never shared with Jarred.  Defendant Gibbons made it clear in an email on May 3, 2017 that these false and inflammatory statements were specifically designed to taint the discipline process when he stated that he gave the Board the information so that it could "understand what's going on better to assist in your decision making process."  Ms. Schmidt's recommendation to Gibbons was to initiate another investigation and if he felt in danger, to call the police.

41.     On May 4, 2017, the Student Conduct Board issued its findings and Jarred was found to have committed two code of conduct violations: theft of the University's computer, and unauthorized access to university premises.  Jarred was placed on probation for the remainder of his time at Case, and was told that he was now "persona non grata" meaning that Jarred was prohibited from entering into the Sears' Design Lab, including the Lab itself, and all the rooms on the 3d floor of the Glennan Building, which are the same rooms housing the electrical engineering program of which Jarred Glickstein is a paying student.  Jarred was further advised that he could not access any of these areas without prior permission from the Student Conduct Office.  This particular sanction was the precise discipline requested of the Conduct Office by Defendant Gibbons.

42.     Jarred filed a timely appeal based on the University's failure to accommodate his anxiety disorder, failure to follow its own procedures and policies, and other grounds.  This appeal was denied.

43.     On May 5, 2017, Defendant Gibbons sent an email to all the members of the faculty and staff in the electrical engineering department which included at least 22 people.  In that email Gibbons told the recipients that "with much regret and discomfort" he needed to advise that Jarred had been found to have committed "felony offenses."  Gibbons knew this statement to be false when he made it.

44.     Gibbons further advised that Jarred had been banned from the third floor of the Glennan Building including the Sears Undergraduate Design Laboratory "**for life.**" Gibbons knew this statement was false.  The disciplinary sanction did not say anything of the kind.

45.     Gibbons further advised in the email that if Jarred was seen in any of the prohibited rooms, the recipients should "call the CASE Police **Immediately** and he is to be arrested for illegal trespassing…."  Gibbons knew this statement was false and that this would create a dangerous situation for Jarred.  Not a single recipient of this email, including Kenneth Loparo, Director of the Electrical Engineering program, or Lawrence Sears, who sits on the Board of Trustees, ever made any effort to correct the gross mischaracterizations and outright lies contained in this email.

46.     In response to this email, one of Jarred's former professors, Pedram Mohseni, stated "[t]his is indeed troubling, especially since I know Jarred." "Jarred is currently a gradate (sic) student in the laboratory of Prof. Soumyajit Mandal (CC'ed on this email). As such, he presumably has easy access to equipment and other materials in both Dr. Mandal's laboratory and my own laboratory that is co-located with Dr. Mandal's. Should we be worried about his access? Do we know more about the nature of this incident and Jarred's true motives?"

47.     On May 26, 2017, Gibbons emailed a number of staff advising that Jarred had equipment belonging to the University and that because the combined value exceeded $1000, this was a

"felony offense."  In an email two weeks earlier, this same equipment was described by Gibbons as having been "loaned" to Jarred.  Gibbons knew this statement was false, and nobody at the University did anything to correct it.   Again, nobody ever attempted to correct or retract the characterization of Jarred as a "felon" though they knew this was false.

48.     Indeed, nobody at Case ever even made an effort to stop Gibbons from continuing to make false and inflammatory statements about Jarred.

49.     Nine weeks after Gibbons sent the false, defamatory email to everyone in the Electrical Engineering Department, George O'Connell, head of the Student Conduct Office sent a "clarification" email to only half of the original email recipients.  Jarred also never received this email.  The email never retracted the statement that Jarred was a "felon" but only clarified that the disciplinary process is not a criminal proceeding.  No effort was made to determine how many other people were told about the false and defamatory statements made in the original email.  The remaining recipients of the original email have never been notified of the "clarification."  The communications from Gibbons both in emails and elsewhere publicized information to such a large group that they were likely to reach the public.

50.     Jarred was on track to complete his Master's Degree in Electrical Engineering at Case in May 2017.  Because of the stress and time the disciplinary process took, Jarred did not complete his degree requirements until December 2017.  In the interim Jarred has been deprived of job opportunities, and has incurred significant expense in connection with the discriminatory and false statements about him.  Jarred continues to struggle in the program where he is still enrolled as a student.

51.     Jarred has been excluded from participating in Department events, and has been shunned by people who had previously respected him.  Jarred's anxiety has made it difficult for him to

function at all on some days.  He had to hire a person to accompany him to campus because of his fear that Gibbons or someone else would falsely accuse him of stealing. He has been ostracized, remains fearful of daily interactions, and has been unable to seek admission to another program elsewhere because he is living in a family home purchased for him to live in Cleveland, and because the discipline on his record makes it unlikely that he would be admitted elsewhere.

52.    Jarred has suffered severe humiliation, unable to pick up his mail without permission. Upon being notified of one departmental event, Jarred could not attend because permission was not granted until it was too late to attend.  Classes he has signed up for needed to be moved to another location because of his inability to attend on the third floor of Glennan.  Interactions with faculty are fraught with concern regarding what they may think of him, and many of those reactions to Jarred make it clear that they are suspicious of him.

53.    Finally, Jarred went from being an outstanding student working through his disabilities; a student who had never been in trouble; a student on his way to several postgraduate degrees from what he believed was a prestigious University, to now feeling like a pariah, excluded from his Department's programs, and unable to access locations necessary to his degree without fear and humiliation.  He is afraid to be on the campus for fear of being falsely accused again.

54.    Jarred has repeatedly requested that Case issue a public retraction of the defamatory statements, and lift the unwarranted sanction arising out of the blatant violation of the University's policies, but Defendant Case has refused.

55.    Jarred has suffered severe emotional and mental harm, and his current and future employment prospects have been damaged.  Plaintiff has suffered obvious reputational injuries as a result of the defamatory statements made about him.  Plaintiff has been subjected to a hostile environment because of his actual and perceived disabilities.

## COUNT I

## DISABILITY DISCRIMINATION IN VIOLATION OF TITLE III OF THE AMERICANS WITH DISABILITIES ACT

56.     Plaintiff reasserts the foregoing allegations and incorporates them by reference as if fully set forth herein.

57.     Title III the Americans with Disabilities Act (ADA) provides that "[n]o individual shall be discriminated against on the basis of disability in the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of any place of public accommodation." 42 U.S.C. § 12182(a).

58.     Plaintiff has a diagnosis of Autism, depression and anxiety disorder, impairments which substantially limit major life activities including brain functions per 34 C.F.R. § 36.105(d)(2)(iii)(E).

59.     Plaintiff is a qualified individual with a disability pursuant to 42 U.S.C. §§12102(1),(3); 34 C.F.R. §36.105(a)(1)(i)-(iii). Jarred also has a record of having an impairment as he received accommodations through Case's Office of Disability Services.

60.     Jarred was also regarded as a person with an impairment and was considered as a person with mental illness by Defendant Gibbons who disseminated false information about Jarred based on myths and stereotypes that Jarred was dangerous and this misinformation contributed to the discipline and exclusion imposed on Jarred, denying him equal access to Defendant Case's programs, activities, services and facilities.

61.     Defendant Case is a private entity which owns, leases or operates a place of public accommodation and, as such, is a place of public accommodation subject to the nondiscrimination requirements of the ADA. 34 C.F.R. §36.104(10).

62.     Defendant Case has engaged in illegal disability discrimination, as defined by Title III, by excluding Jarred from full and equal access to the lab facilities and engineering program based on his actual, record of and/or perceived disabilities.

63.     Defendant Case unlawfully discriminated against the Plaintiff based upon his actual and/or perceived disabilities when it unjustly imposed discipline, excluding the Plaintiff from equal access to Case's programs, services, activities and facilities.

64.     Defendant Gibbons, acting in the course and scope of his employment with Defendant Case, regarded the Plaintiff as a person with mental /emotional disabilities and, based upon stereotyping, myths and assumptions about those disabilities, made false and stigmatizing accusations about Plaintiff's character and actions.  Case relied upon those false and biased accusations when it imposed disciplinary action, resulting in the Plaintiff's discriminatory exclusion from Case's programs, services, activities and facilities. This exclusion continues to occur on a daily basis.

65.     Nobody on the Student Conduct Board, or anywhere else at Case, inquired as to whether Jarred's disability precipitated Defendant Gibbons' accusations against him, even though Gibbons repeatedly asserted that he believed Jarred had a disability, and that his concern began because "of the overall way he presents himself."  All of the professors who had Jarred as a student knew he had a disability.

66.     No other person was ever even investigated for the alleged theft of the computer, even though nobody ever had any evidence or reason to believe Jarred took it.  Jarred was clearly targeted because he looked or acted differently as a result of his disabilities.  This targeted discrimination continued after Gibbons made obviously false statements that Case staff and faculty have acknowledged to be false.

67.     The entire disciplinary process against Jarred Glickstein arose out of the perceived "threat" his disability presented.  Even when Case knew that Gibbons lied about Jarred having been removed from his two prior universities under "extenuating circumstances" no alteration was made to his sanction.  As a result, Jarred continues to be ostracized, excluded from his Department, from teaching opportunities necessary to his degree, and requires a bodyguard when he appears on campus to protect himself from this discriminatory behavior.

68.     Case, knowing the falsity of the statements made about Jarred, acted with deliberate indifference in refusing to revisit the sanction, continuing to exclude Jarred, and refusing him permission to do the most basic things at Glennan, such as retrieving his mail, which he was told he would have to make other arrangements to do.  This indifference was with knowledge of Jarred's disabilities, and the fact that he was targeted by Gibbons as a result.

69.     As a direct result of this discrimination, and his exclusion from the Department, ostracized and shunned by peers and faculty alike, Jarred Glickstein has suffered, and continues to suffer from the disability discrimination which continues to the present.

## COUNT II

## DISABILITY DISCRIMINATION IN VIOLATION OF SECTION 504, REHABILITATION ACT OF 1973

70.     Plaintiff reasserts the foregoing allegations and incorporates them by reference as if fully set forth herein.

71.     Defendant Case is a "university" and recipient of federal financial assistance as defined in 29 U.S.C. §794 (a) and (b)(2), and is subject to the nondiscrimination provisions of that statute and the accompanying regulations.

72.     Plaintiff is an "individual with a disability" pursuant to 29 U.S.C. §705(20)(B), which utilizes the same definition as the ADA, described above in Count I.

73.     Defendant Case unlawfully discriminated against the Plaintiff when it unjustly imposed discipline, excluding the Plaintiff from equal access to Case's programs, services, activities and facilities.  This exclusion was based solely on disability, and is attributable to the remarks made by Defendant Gibbons.  This exclusion continues to occur on a daily basis.

74.     Defendant Gibbons, acting in the course and scope of his employment with Defendant Case, regarded the Plaintiff as a person with mental /emotional disabilities and, based upon stereotyping, myths and assumptions about those disabilities, made false and stigmatizing accusations about Plaintiff's character and actions.  Case relied upon those false and biased accusations when it imposed disciplinary action, resulting in the Plaintiff's discriminatory exclusion from Case's programs, services, activities and facilities. Gibbons repeatedly asserted that he believed Jarred had a disability, and that his concern began because "of the overall way he presents himself."  All of the professors who had Jarred as a student knew he had a disability.

75.     No other person was ever even investigated for the alleged theft of the computer, even though nobody ever had any evidence or reason to believe Jarred took it.  Jarred was clearly targeted because he looked or acted differently as a result of his disabilities.  This targeted discrimination continued after Gibbons made obviously false statements that Case staff and faculty have acknowledged to be false.

76.     The entire disciplinary process against Jarred Glickstein arose out of the perceived "threat" his disabilities presented.  Even when Case knew that Gibbons lied about Jarred having been removed from his two prior universities under "extenuating circumstances" no alteration was made to his sanction.  As a result, Jarred continues to be ostracized, excluded from his Department, from teaching opportunities necessary to his degree, and requires a bodyguard when he appears on campus to protect himself from this discriminatory behavior.

77.    Case, knowing the falsity of the statements made about Jarred, acted with deliberate indifference in refusing to revisit the sanction, continuing to exclude Jarred, and refusing him permission to do the most basic things at Glennan, such as retrieving his mail, which he was told he would have to make other arrangements to do.  This indifference was with knowledge of Jarred's disability, and the fact that he was targeted by Gibbons as a result.

78.    As a direct result of this discrimination, and his exclusion from the Department, ostracized and shunned by peers and faculty alike, Jarred Glickstein has suffered, and continues to suffer damage to the present in an amount to be determined at trial.

<u>COUNT III</u>

<u>BREACH OF CONTRACT</u>

79.    Plaintiff reasserts the foregoing allegations and incorporates them by reference as if fully set forth herein.

80.    The Case Student Handbook and Disciplinary Policies constitute a valid, binding and enforceable contract between Case and Jarred Glickstein.

81.    Plaintiff has fully complied with all his obligations under the Case policies and Handbook, and there is valid consideration that supports this agreement.

82.    Case breached its obligation under the policies related to the conduct of the disciplinary hearing when it allowed inflammatory, defamatory and irrelevant information to be presented at the hearing all of which was designed to taint the hearing process, and which in fact did.  Case also violated its policies by failing to provide Jarred with all the information necessary to the hearing as required.

83.    Further, no effort was made at any time to investigate anyone else for the alleged theft of the computer, despite the obvious vendetta John Gibbons displayed in his behavior toward Jarred, the fact that he made verifiably false statements about Jarred that were unrelated to the

proceedings and which should have raised a question as to the veracity of all his allegations. This was a catastrophic violation of the University's Code of Conduct which is part of the agreement between the parties. Case's policies require that only relevant information be permitted to be considered in a disciplinary proceeding.

84.     As a direct and proximate result of this breach, Plaintiff has been, and continues to be, injured in an amount to be determined at trial.

COUNT IV

DEFAMATION

85.     Plaintiff reasserts the foregoing allegations and incorporates them by reference as if fully set forth herein.

86.     Defendant Gibbons, acting at all times in the course and scope of his employment at Case, made defamatory statements about Jarred Glickstein that he knew to be untrue at the time they were made. Some of these statements were oral, constituting slander per se, while others were written in numerous emails (libel per se). These statements accused Jarred of an indictable offense, degraded and humiliated Jarred, and held him up to contempt and scorn by those to whom they were published. All of these false statements injured Jarred's personal and professional reputation.

87.     Gibbons accused Jarred numerous times, of being a thief, a felon, being violent and dangerous, and advising staff and faculty that Jarred was forever excluded from the Sears Lab and the third floor of Glennan. Gibbons knew these statements were false, and intended them to harm Jarred by assuring that he would be disciplined and excluded from the third floor of Glennan. No immunity attaches to any of Gibbons' false statements, including those made at the time of the

disciplinary hearing, since they were wholly unrelated to the proceedings at hand, and had no bearing on the charges against Jarred.

88.     The context in which these statements were made, the fact that they were verifiably false, and the obvious intent to create a loathing and fear of Jarred Glickstein would leave any reasonable person to believe that Jarred presented a threat, and was in fact, a criminal.  The email by Jarred's former professor, Pedram Mohseni, is a clear indication of the fear that these statements created.  These statements were published numerous times to faculty and staff, including to some of the top administrators in the Electrical Engineering Department and Board of Trustees of the University.

89.     Defendant Case knew about and ratified the false and defamatory statements made against Jarred by permitting Gibbons to make false statements to numerous individuals about Jarred and without ever seeking to stop or retract the statements.  Case's Student Conduct Board ratified the irrelevant and highly damaging statements made at the hearing by acknowledging that Jarred could be like the "Weatherhead Shooter" and by failing to inquire as to the veracity of any of the allegations even though the entirety of the "investigation" was largely based on unfounded and false statements made by Defendant Gibbons.

90.     Case continued to ratify the defamatory statements by sanctioning Jarred and excluding him from the Department, causing severe humiliation, emotional distress, and expense.

91.     Case acknowledged the May 11, 2017 email in responses to Gibbons, and allowed the false statements regarding his exclusion from Glennan and his supposed criminal liability to remain to this day.

92.     Gibbons made knowingly false statements and Defendant Case knowingly and affirmatively ratified those statements which have falsely tainted and permanently damaged Jarred Glickstein.

93.     Jarred Glickstein has suffered, and continues to suffer, reputational injury, economic loss, and other damages as a result of this tortious conduct.

<u>COUNT V</u>

<u>FALSE LIGHT INVASION OF PRIVACY</u>

94.     Plaintiff reasserts the foregoing allegations and incorporates them by reference as if fully set forth herein.

95.     Defendant Gibbons, acting at all times in the course and scope of his employment with Defendant Case, made false and inflammatory statements that placed Jarred Glickstein in a false light to others.  These statements, which included identifying Jarred as a threatening, violent criminal who might shoot people at the school, were of a nature such that they would be highly offensive to a reasonable person.  Gibbons also publicized statements regarding Jarred's mental health issues for the purpose of stigmatizing and damaging Jarred.

96.     The statements made by Defendant Gibbons were made knowingly and/or with reckless disregard to their falsity or to the false light in which they would place Jarred.

97.     The statements made by Defendant Gibbons were publicized to a large group of people such that it is reasonable to believe they had become public.

98.     These statements placed Jarred Glickstein in a false light to his friends and colleagues.

99.     Defendant Case, knowing that these statements were false, that they were publicized, and that they placed Jarred Glickstein in a false light, ratified and affirmed these statements by failing to correct them, and by continuing to suggest that Jarred's presence alone might require police involvement.

100.    Jarred Glickstein has suffered an invasion of his privacy, has suffered and continues to suffer damages, pain and emotional distress, and has been ostracized and excluded as a result of these false statements.

COUNT VI

VIOLATION OF OHIO REVISED CODE SECTION 4112.022

101.    Plaintiff reasserts the foregoing allegations and incorporates them by reference as if fully set forth herein.

102.    Plaintiff is a qualified person with a disability pursuant to O.R.C. § 4112.01(A)(13).

103.    Defendant Case is a place of public accommodation pursuant to O.A.C. § 4112.5.02.

104.    Pursuant to O.R.C. § 4112.022, Defendant Case is also an "educational institution."

105.    Defendant Case's actions in excluding the Plaintiff from participation in and access  to Defendant's programs, services, activities and facilities based upon Plaintiff's disabilities violate § 4112.022 which provides that: "It shall be an unlawful discriminatory practice for any educational institution to discriminate against any individual on account of any disability….(B) In permitting participation in any activity that is sponsored by the institution or that takes place on property owned, operated, or controlled by the institution…."

106.    Defendant Case's actions as described above, violate O.A.C. § 4112-5-09(C)(1)which provides that "No qualified disabled student shall, on the basis of disability, be excluded from participation in, be denied the benefits of, or otherwise be subject to discrimination under any academic, research, …. or other post-secondary education program or activity to which this rule applies."

107.    Defendant Case's actions also violate subsection O.A.C. § 4112-5-09(C)(3) which provides: "An educational institution may not, on the basis of disability, exclude any qualified

disabled student from any course, course of study, or other part of its education program or activity.

108.     Case knew that Jarred had a disabilities,, that he was targeted by Gibbons because of his disabilities, and subsequently disciplined because of his disabilities and excluded Jarred from access to the Glennan third floor, and from participation in other activities and events as a consequence.

109.     Plaintiff has suffered damages as a result of this discrimination, emotional stress, expenses, and continues to suffer from this discrimination to the present.

<u>COUNT VII</u>

<u>INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS</u>

110.     Plaintiff reasserts the foregoing allegations and incorporates them by reference as if fully set forth herein.

111.     Defendant Case and Defendant Gibbons acted in a shocking, outrageous and extreme manner by conducting a flawed investigation, refusing to consider other possible perpetrators of the theft, including failing to investigate Defendant Gibbons after he lied about Jarred's being a criminal and having been removed from his prior colleges under "extenuating circumstances," making and ratifying horrific and untrue statements about Jarred, including that he was likely to shoot and kill people and that he could not be trusted because he was a thief, and other damaging statements. All of these statements were made with intent to harm Jarred Glickstein.

112.     Defendant Case further acted in a shocking and outrageous manner by conducting a disciplinary hearing without regard for the truth, or the damaging nature of statements made which were wholly irrelevant to the proceedings. As a direct and proximate result of this outrageous and conscience shocking behavior by all Defendants, Jarred Glickstein was sanctioned

and excluded from his Department, cut off from faculty and staff, ostracized by friends and colleagues and suffered and continues to suffer extreme emotional distress.

113.    Plaintiff has incurred and will continue to incur significant damage as a direct result of Defendants' intentional infliction of emotional distress.

WHEREFORE, Plaintiff demands judgment of Defendants, jointly and severally, as follows:

A.  Compensatory damages against the Defendants in an amount the Court deems just;

B.  Punitive damages against all Defendants;

C.  Injunctive relief prohibiting Defendant Case from continuing to impose sanctions, and injunctive relief against Defendant Gibbons prohibiting him from speaking to or about Jarred Glickstein and a public retraction of all damaging statements by both Defendants;

D.  An award of attorney fees and costs of this action pursuant to all relevant statutes;

E.  Such other relief as the Court deems just.


Respectfully submitted,

 /s/ *Aimee E. Gilman*
Aimee E. Gilman, Esq. (0031682)
Kerry M. Agins, Esq. (0072558)
Susan Tobin, Esq. (0021725)
Agins & Gilman LLC
5035 Mayfield Rd., Suite 250
Lyndhurst, OH 44124
(216) 291-4332 (Ph.); (216) 291-2077 (fax)
Email: agilman@idealaw.org
       kagins@idealaw.org
       stobin@idealaw.org

## **JURY DEMAND**

Plaintiff hereby demands a trial by jury.

/s/ Aimee E. Gilman
Aimee E. Gilman  (0031682)
Counsel for Plaintiff